## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

TAWNI BENNETT, individually and on
behalf of all other similarly situated,

        Plaintiff,

        v.

CELTIC INSURANCE COMPANY,
CR INSURANCE GROUP, LLC, and
JOEL ORTIZ

        Defendants.

Case No. 20-cv-06172

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Tawni Bennett brings putative class-action claims against
Defendants Celtic Insurance Company, CR Insurance Group, LLC, and Joel Ortiz for
violating the Telephone Consumer Protection Act (TCPA) and the Illinois Automatic
Telephone Dialers Act (IATDA). [15]. She alleges that Defendants "placed thousands
of nonconsensual automated or prerecorded calls to consumers' cellphones," including
hers, using an "automatic telephone dialing system." *See id*. at ¶¶ 1–3. This Court
previously dismissed Plaintiff's claims against Defendants CR and Ortiz for lack of
personal jurisdiction. *See* [40]. Defendant Celtic now moves to dismiss Plaintiff's
TCPA and IADTA claims for failure to state a claim pursuant to Federal Rule of Civil
Procedure 12(b)(6). [25]. For the reasons explained below, this Court grants Celtic's
motion.

I.      **The Complaint's Allegations**

In December 2019, Plaintiff began receiving telemarketing calls on her cellular phone trying to sell her health insurance. [15] at ¶¶ 10, 19. These unsolicited calls continued through October 2020, even though Plaintiff registered her cellphone number on the National Do-Not-Call Registry in 2014. *See id*. at ¶¶ 39–40, 54. Plaintiff incurred charges for the calls. *Id*. at ¶ 52.

Plaintiff claims that the calls were made using an automatic telephone dialing system (ATDS). *Id*. at ¶ 28. She knew this because the calls were prerecorded, "sounded the same," and "had the same or substantially similar" generic message that "the caller had a 'very important call to help you' with 'renewal of your insurance.'" *Id*. at ¶¶ 24–29. Plaintiff additionally alleges, based on "information and belief," that the ATDS at issue can "store or produce telephone numbers . . . using a random or sequential number generator" and "dial numbers without human intervention." *Id*. at ¶¶ 44–45. She states that the caller used "spoofed" phone numbers because most calls she received "displayed a different number." *Id*. at ¶¶ 21, 41.

While investigating the source of the calls, Plaintiff connected with the caller's live operators on two occasions. *Id*. at ¶ 31. The live operators "identified themselves as sales agents who worked with Ambetter to sell an Ambetter plan." *Id*. One of them referred to the insurance product as "our plans" and stated that she was calling "with Ambetter" from "the call center." *Id*. Ambetter, the only policy offered in the calls, is a product of Defendant Celtic. *Id*. at ¶¶ 31–32, 35. Upon agreeing to purchase

2

"the health insurance product offered in the calls," Plaintiff received a copy of the insurance policy, which "confirmed" that the "calls and product sold were from, or on behalf of Celtic." *Id.* at ¶ 34.

Plaintiff alleges that "Defendants promote and market Celtic services and products" through unlawful telemarketing. *Id.* at ¶ 15. In her second amended complaint, she names as Defendants CR and Ortiz, "licensed and authorized Celtic insurance broker and/or sales agent[s]," and Celtic, a company that "hires, authorizes, and pays third-party brokers and sales agents, including but not limited to CR and Ortiz," to sell its products via telemarketing. *Id.* at ¶¶ 11–13.

Plaintiff also alleges that "Celtic and/or CR" provided "interim instructions" to "CR and/or Ortiz regarding the calls" and specified "the geographic location and/or volume of the calls." *Id.* at ¶¶ 73–75. Additionally, "Defendants specified the criteria of potential customers," allowed their marketers to access "records and data concerning the persons called," and "had access to the sales and customers generated by the illegal robocalling." *Id.* at ¶¶ 77–79. Finally, Plaintiff claims that she reasonably believed "the telemarketers who called her had received permission, authority, and instruction to conduct activity on behalf of Defendant Celtic." *Id.* at ¶ 82.

## II.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) tests the factual sufficiency of a complaint. To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to

relief," Fed. R. Civ. P. 8(a)(2), so the defendant could have "fair notice" of the claim and "the grounds upon which it rests." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

The plaintiff is not required to provide "detailed factual allegations" at the pleading stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The alleged facts, however, must be enough to raise a facially plausible right to relief. *Twombly*, 550 U.S. at 569. Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 356 (7th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678).

When deciding a Rule 12(b)(6) motion, this Court accepts "all well-pleaded allegations of the complaint as true," and draws all reasonable inferences in favor of the plaintiff. *Iqbal*, 556 U.S. at 678. This Court, however, need not accept a complaint's legal conclusions and "threadbare recitals of the elements of a cause of action." *Id.*; *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

## III. Analysis

In its motion, Celtic seeks to dismiss both of Plaintiff's claims for failure to state a claim. This Court considers the sufficiency of the allegations as to each claim in turn.

### A. The Sufficiency of Plaintiff's TCPA Allegations

The TCPA makes it "unlawful to use an automatic telephone dialing system or an artificial or prerecorded voice message, without the prior express consent of the

4

called party, to call any . . . cellular telephone . . . for which the receiver is charged for the call." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 373 (2012); *see also* 47 U.S.C. § 227(b)(1)(A)(iii). An entity violates the TCPA and may be held directly liable if it initiates the unlawful calls to the plaintiff; an entity may also be liable vicariously, under common law agency principles, if third parties make calls on its behalf. *See Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 771–73 (N.D. Ill. 2014) (citing *In re Joint Petition filed by Dish Network, LLC*, 28 FCC Rcd. 6574 (2013)).

Plaintiff claims that Celtic is directly or vicariously liable for the unlawful calls at issue in this case. [15]. She alleges that she received calls from "Defendants," CR, Ortiz, or an unknown telemarketer. *See id.* at ¶¶ 11, 19, 57, 63, 68. She further claims that Celtic is liable as part of a joint enterprise with CR and Ortiz for the alleged TCPA violations. *Id.* at ¶¶ 104–15. Celtic argues that Plaintiff's claims fail for various reasons, including that she did not allege facts showing that Celtic itself physically placed the calls and did not allege facts to demonstrate any agency relationship between Celtic and the individuals or entities that called her. [25].

### 1. Liability Based upon CR and Ortiz's Actions

As a preliminary matter, this Court dismissed Plaintiff's joint enterprise allegations based upon its prior dismissal of CR and Ortiz for lack of personal jurisdiction. *See* [40]. For the same reasons, this Court dismisses Plaintiff's allegations seeking to hold Celtic vicariously liable for the actions of its purported agents CR and Ortiz. Although Plaintiff claims that CR and Ortiz have engaged in

unlawful telemarketing, *see, e.g.*, [15] ¶ 85, her complaint does not plausibly link their conduct to the calls *she* received. She never spoke to either of them and does not allege any connection between them and the live operators with whom she spoke.

### 2. Liability Based Upon the Ambetter Representative

Plaintiff also seeks to hold Celtic liable for the calls that wound up connecting her to the Ambetter call center representative. But, again, Plaintiff failed to allege facts that would provide a substantive basis to hold Celtic either directly or vicariously liable for the calls that connected her to Ambetter's call center.

### a. Direct Liability

Direct liability exists when a defendant "initiates" the disputed phone call. *Smith*, 30 F. Supp. 3d at 771. Initiation occurs when the defendant physically places the calls or is "so involved in" their placement that it essentially made them itself. *Warciak v. Subway Rests., Inc.*, No. 1:16-CV-08694, 2019 WL 978666, at *2 (N.D. Ill. Feb. 29, 2019), *aff'd*, 949 F.3d 354 (7th Cir. 2020). The "so involved" standard is demanding; a defendant "generally does not 'initiate' calls placed by third-party telemarketers," even if the third party had acted on its behalf. *Smith*, 30 F. Supp. 3d at 771.

Plaintiff does not claim that Celtic made the calls. Instead, she alleges that "Defendants utilized a systematic telemarketing campaign whereby robocalls were placed in a seamless process to make it appear to Plaintiff and Class Members that Defendant, Celtic, was calling them directly, or that they were being called on Defendant Celtic's behalf, from Defendants' telemarketing department or call

center." [15] at ¶ 68; [32]. But her allegations do not demonstrate that Celtic was "so involved" in placing the calls at issue.

The allegations relating to her conversations with the live operators show at best that the calls originated from *Ambetter*'s call center. But Plaintiff does not plausibly tie Ambetter to Celtic. Plaintiff does allege that the Ambetter plan is a product promoted and sold by Celtic, *id.* at ¶ 35, but she does not allege, for example, that Ambetter is sold exclusively by Celtic, that Ambetter is otherwise synonymous with Celtic, or that anyone selling Ambetter necessarily worked for Celtic. Plaintiff alleges that the insurance policy she received after talking with the live operators "further confirmed that the calls and product sold were from, or on behalf of Celtic." *Id.* at ¶ 34. But she alleges no facts to suggest anything more than the identification of the Ambetter product; certainly she alleges nothing about the actual content of the policy, or any facts to tie Celtic (as opposed to Ambetter) to its issuance. In short, this allegation is conclusory, and the Court need not accept it as true.

*Smith* and *Warciak* are dispositive. In both *Smith* and *Warciak*, the court dismissed the direct liability claim because the plaintiff acknowledged that a third party was responsible for the disputed telemarketing activities. *See Smith*, 30 F. Supp. 3d at 771; *Warciak*, 2019 WL 978666, at *2. Here, although Plaintiff did not explicitly acknowledge the point, she did not allege facts affirmatively raising a plausible right to relief. Plaintiff has not alleged facts that plausibly establish that Ambetter is Celtic; nor has she alleged facts showing that a call from a person selling

Ambetter necessarily equates with Celtic. This Court therefore finds that Plaintiff's allegations fail to state a claim against Celtic for direct liability under the TCPA.

### b.    Vicarious Liability

The TCPA additionally holds a defendant vicariously liable for the unlawful telemarketing activities conducted by its third-party agents. *Warciak*, 949 F.3d at 356. Parties create an agency relationship "when a person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents to act." Restatement (Third) of Agency § 1.01 (2006). Plaintiff here argues that an agency relationship exists between Celtic and the telemarketers from Ambetter's call center, and she bases her argument on her allegation that the caller never advised her that it was not an Ambetter/Celtic representative or that it was not an authorized agent of Ambetter/Celtic. [15] at ¶ 33. But the failure to disclose a non-connection does not necessarily create an agency relationship; indeed, by that purported standard, almost anyone could be liable.

Agency is "typically a factual issue" that warrants discovery. *See Mauer v. Am. Intercontinental Univ., Inc.*, No. 16 C 1473, 2016 WL 4651395, at *2 (N.D. Ill. Sept. 7, 2016) (citing *Charvat v. Allstate Corp.*, 29 F. Supp. 3d 1147, 1151 (N.D. Ill. 2014)). At the motion to dismiss stage, a plaintiff need not identify the third-party telemarketer responsible for her injury or "what arrangement that third party had" with the defendant, *see id.*, because only the defendant "can reasonably be expected to know these facts," *Charvat*, 29 F. Supp. 3d at 1151. The complaint must, however,

allege facts sufficient to support an inference that the defendant acknowledges the telemarketer's activities.

In *Charvat*, the court found the plaintiff's allegation that the prerecorded call stated it was *backed by* the defendant sufficient to establish a substantive basis for vicarious liability. 29 F. Supp. 3d at 1150–51. Likewise, in *Vessal v. Alarm.com*, the court denied dismissal of the plaintiff's agency claims because she asserted that her callers used the named defendant's website. No. 17 C 2188, 2017 WL 4682736, at *3 (N.D. Ill. Oct. 18, 2017). And, in *Mauer*, the court found a plausible connection between a telemarketer and the defendant when, minutes after the telemarketer received the plaintiff's investigator's phone number, the defendants called the investigator via the same number. 2016 WL 4651395, at *2.

Conversely, courts have dismissed complaints that only allege a contractual relationship between the telemarketer and the defendant, *see Warciak*, 949 F.3d at 356, or the telemarketer's one-sided namedropping of the defendant's product, *see Cunningham v. Health Plan Intermediaries Holdings, LLC*, No. 17-CV-1216, 2018 WL 835222, at *6 (N.D. Ill. Feb. 13, 2018) (dismissing the plaintiff's apparent authority claim because he based it solely upon the telemarketer's mentioning the defendant's name and product).

Here, Plaintiff's complaint only alleges the live operators' one-sided namedropping of Ambetter, a product available from Celtic and possibly others. She does not allege facts suggesting that Celtic actively interacted with the live operators by "backing" them or allowing them to use or sell its exclusive products. She also

9

does not claim that she has interacted with Celtic at all, let alone immediately after connecting with the telemarketer. Because Plaintiff's allegations do not support the existence of active interactions between the telemarketer and the defendant, this Court dismisses her vicarious liability claims against Celtic based upon the Ambetter caller.

### B. The Sufficiency of Plaintiff's IADTA Allegations

The IADTA makes it unlawful for a person to "operate an autodialer in this State except in accordance with this Act." 815 Ill. Comp. Stat. 305/10. To state a claim under the IADTA, a plaintiff must allege that: "(1) she is a telephone customer; (2) the defendant placed a call using an autodialer; (3) the defendant played a prerecorded message; (4) the call was not made with her consent; and (5) she was injured by the defendant's alleged violation." *Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 905 (N.D. Ill. 2012); 815 Ill. Comp. Stat. 305/30(b)–(c).

Plaintiff alleges that Celtic violated the IADTA because Celtic "caused calls to be made to the phones of Plaintiff" using an autodialer that played a prerecorded message. [15] at ¶ 158. As discussed above, however, Plaintiff has not plausibly alleged that either Celtic or its third-party agent placed the calls she received. This Court, therefore, finds that Plaintiff's allegations fail to state a claim under the IADTA and dismisses her IADTA claims against Celtic.

### IV. Conclusion

For the reasons explained more fully above, this Court grants Defendant Celtic's Rule 12(b)(6) motion to dismiss [25] and dismisses Counts I through VI of

Plaintiff's second amended complaint. The Court notes that Plaintiff has already amended her complaint twice, including once in response to Celtic's Rule 12(b)(6) arguments. Yet, given Rule 15(a)(2)'s mandate to freely give leave to amend, the Court will give Plaintiff one last chance to cure the deficiencies noted above. *E.g., Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015) ("a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed."). If, consistent with Rule 11, Plaintiff can allege facts to support her claims against Celtic, she may amend her complaint by April 15, 2022. If Plaintiff fails to file an amended complaint by this date, the Court will dismiss this case.

Dated: March 23, 2022            Entered:

John Robert Blakey
United States District Judge

11